UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X     12-711 M

IN THE MATTER OF AN APPLICATION FOR     AFFIDAVIT IN SUPPORT OF
A SEARCH WARRANT FOR:                   APPLICATION FOR A SEARCH
                                        WARRANT
THE PREMISES KNOWN AND DESCRIBED AS
ELECTRONIC MAIL ADDRESS
PARAMOUNTPICS1@aol.com

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

      ROBERT MANCENE, being duly sworn, deposes and states that he is a Special Agent with Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that there is located in THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESS "PARAMOUNTPICS1@aol.com" (the "EMAIL PREMISES") subscriber/profile information, email transmission information, subject headings, to/from information, folders and email content (including all of the foregoing for deleted messages), as described more fully in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 875, 2422 and 2252A(a)(5)(B).

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with HSI since 1996. For about the past three years, I have been assigned to an HSI Child Exploitation Group in New York City. In that capacity, I have conducted investigations into federal crimes relating to the sex trafficking of minors, Mann Act violations and child pornography. As an HSI Special Agent, I have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, victims and witnesses, and have participated in investigations that included the interception of wire communications. Through my training, education and experience, I have become familiar with the manner in which individuals conduct and conceal activity involving the sexual exploitation of children.

2. I have personally participated in the investigation of the offenses discussed below. I am thoroughly familiar with the information contained in this Affidavit, based upon the investigation that I have conducted with other experienced law enforcement officers, my communications with them and other witnesses, and my review of documents and items.

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

THE SUBJECT EMAIL PREMISES

3. In or about March 2012, I was notified by New York City Police Department ("NYPD") detectives that a 15-year-old girl ("Jane Doe") from Brooklyn, New York had reported that she was sexually assaulted several days earlier by a man named "John."

Interview of Jane Doe

4. On or about April 5, 2012, at my request, Jane Doe was interviewed by a clinical forensic specialist. During the interview, Jane Doe stated, in part and substance:

  a. Prior to March 17, 2012, she had posted an ad on Craigslist indicating that she was a "Teen in need of a afterschool &amp; weekend job (NYC)."

  b. In early March, someone named "John Archambeault" (who was subsequently identified as GREGORY JOHN SCHAFFER) responded to her ad by email from the EMAIL PREMISES, stating that he was "looking for part time help in my store in Newport mall in Jersey city" [sic].

  c. In subsequent email communication in which SCHAFFER used the EMAIL PREMISES, SCHAFFER and Jane Doe arranged to meet to further discuss a purported employment opportunity for Jane Doe in one of SCHAFFER's "stores." SCHAFFER told Jane Doe that he owned retail stores in the Newport Mall, including American Eagle Outfitters, Victoria's Secret, Champs Sports

3

and Spencer Gifts. Schaffer asked for Jane Doe's age, and she told him that she was 15 years old. He also asked whether she would be coming to New Jersey with her parents or alone, and asked her to send a photograph for "security."

d. On or about March 17, 2012, Jane Doe traveled from her home in Brooklyn to SCHAFFER's office in Jersey City, New Jersey, accompanied by a male friend, who was also a minor ("Friend"). Once inside the office suite area, SCHAFFER took Jane Doe into a private office area and closed the door, leaving the Friend in the waiting area.

e. During the March 17th meeting, SCHAFFER told Jane Doe that he was probably going to have her work in his Victoria's Secret store. SCHAFFER also asked Jane Doe whether she was sexually active, which she stated she was, and whether she used drugs. SCHAFFER gave Jane Doe paperwork for her great grandmother, who is Jane Doe's guardian, to sign.

f. That night, Jane Doe's great grandmother signed the paperwork and Jane Doe emailed SCHAFFER at the EMAIL PREMISES to advise him that the paperwork was signed. SCHAFFER responded by email, asking her if she could return the next day with the paperwork. He added that she should come alone because it might be her first day of work.

g. On or about March 18, 2012, Jane Doe again traveled from her home in Brooklyn to SCHAFFER's office, this time alone.

4

    During the March 18th meeting, SCHAFFER gave Jane Doe a "confidentiality agreement," which he asked her to sign. SCHAFFER also gave Jane Doe an employment contract to sign. Jane Doe signed both agreements without reading them carefully.

h. After she had signed them, SCHAFFER informed Jane Doe that by signing them, she had agreed to have sex with him. SCHAFFER had Jane Doe try on "outfits" for him, which included a bathing suit, and took pictures of Jane Doe in the bathing suit. Some time later, SCHAFFER removed his pants, revealing that he was wearing a Speedo bathing suit, and told Jane Doe that he wanted to photograph them together.  At this point, Jane Doe told SCHAFFER that she did not feel comfortable.

i. SCHAFFER asked Jane Doe if she had a boyfriend, to which she responded that she did and that he was 17 years old. SCHAFFER threatened to "report" the boyfriend -- impliedly because Jane Doe and the boyfriend were having sex -- if she broke the contract.  SCHAFFER also threatened to sue Jane Doe's great grandmother for breach of contract.

j. After having Jane Doe lie on his desk, SCHAFFER took a white pill and inserted it into her vagina, telling her it was "birth control."  Jane Doe asked SCHAFFER to use a condom, which he took from the drawer in his desk and put on.

      SCHAFFER then had sexual intercourse with Jane Doe. During the sexual intercourse, Jane Doe attempted to reach for her cell phone several times, but SCHAFFER blocked her hand.

k. Afterward, SCHAFFER told Jane Doe that he would remove the sex part of the contract and gave her a new contract. SCHAFFER shredded the contract that Jane Doe had signed. SCHAFFER told Jane Doe not to speak to anyone about their sexual encounter because that would be a breach of their confidentiality agreement.

l. Jane Doe did not want to have sexual intercourse with SCHAFFER, but was afraid of being sued.

m. When Jane Doe returned home, she told her boyfriend ("Boyfriend") what had happened. The Boyfriend became upset and tore up and disposed of the new contract that SCHAFFER had given to Jane Doe.

n. During the time that Jane Doe was in the PREMISES with SCHAFFER, there was a black camera or video camera on a tripod in SCHAFFER's office. The black camera was in the room when Jane Doe was changing into the bathing suit, and then SCHAFFER replaced it with a red camera after she had changed into the bathing suit. SCHAFFER removed a memory card from the black camera and inserted it into the laptop on SCHAFFER's desk. Jane Doe stated that SCHAFFER put the red camera away during the sexual intercourse. Jane Doe

6

does not know whether there were other cameras in the PREMISES at that time.

Interview of the Friend

5. On May 29 and 30, 2012, I interviewed the Friend, who reported, in part and substance, that he had accompanied Jane Doe to an office in Jersey City for a job interview. The Friend stated that the building in which the office was located bore a sign for a bail bonds business. The Friend stated that Jane Doe and he were met by a man when they entered the office area in the building and that the man took Jane Doe into an interior office through the first door on the left. The Friend remained in the waiting area. Jane Doe was in the interior office with the man for about 45 minutes. After Jane Doe and the Friend had left the building, Jane Doe told the Friend that she had gotten the job and that the man had asked her to return later. When the Friend called Jane Doe the next day, she told the Friend that she was approaching the same Jersey City office building. A couple days later, Jane Doe told the Friend that the man in the Jersey City office had raped her.

Interview of the Boyfriend

6. On May 29 and 30, 2012, I interviewed the Boyfriend, who reported, in part and substance, that after Jane Doe had returned from her second trip to Jersey City, she called him. She was crying and asked him if he loved her, to which the Boyfriend responded affirmatively and asked her what had happened. Jane Doe told the

7

Boyfriend that the job offer had turned into something that she did not want. She explained that the man had taken pictures of her in lingerie and that the man had a photographer friend to whom he could send the photos. But, the man later said that he would post the photos on the Internet if Jane Doe did not have sex with him. Jane Doe also said that she had signed a contract that she thought was for a retail job, but that the man later told her that under the contract, she was legally bound to have sex with him, or else he could sue her. Jane Doe further stated that she had sex with the man because she feared that her great grandmother could get in trouble for letting Jane Doe travel by herself to Jersey City. When the Boyfriend later saw Jane Doe, she showed him the contract. Out of anger, the Boyfriend ripped it up and disposed of it. Jane Doe also showed the Boyfriend a business pen from Schaffer that indicated that SCHAFFER's last name was "Archambeault."

<u>Photo Identification of SCHAFFER</u>

7. Jane Doe and the Friend both identified a photograph of SCHAFFER from a photo array, which indicates that he is Greg Schaffer, who is a 33-year-old man who resides at 24 E. 21st Street, Bayonne, NJ 07002.

<u>Records Checks</u>

8. Publicly available corporate records indicate that there are, in fact, Victoria's Secret, American Eagle, Champs Sports and Spencer Gifts stores at the Newport Center Mall in Jersey City.

8

However, each of these stores is corporately, and not individually, owned and operated. These records further indicate that none of the managers at these stores is "John Archambeault" or Greg Schaffer.

9. On June 3rd, 2010, HSI agents executed a search warrant, issued by a federal judge in the District of New Jersey, for SCHAFFER's office. During the search, agents recovered, among other things, the following:

    a. a folder containing a letter from Jane Doe,

    b. computer-printed photographs of teenage-appearing girls other than JANE DOE wearing bathing suits or naked on a laptop computer,

    c. a red video camera,

    d. a DVR recorder and player,

    e. a large computer monitor,

    f. condoms (both used and unused),

    g. sexual paraphernalia, including lubricants, handcuffs and sex toys,

    h. employment applications, some of which include questions about the applicant's sexual activity and dating status,

    i. a document entitled "Sex Contract."

10. In addition, agents also recovered a document that appeared to be a letter bearing a female name ("JANE DOE 2") at the top. The document reads:

    [JANE DOE 2]

    HERE IS THE DEAL, IHAVE ALL THE STUFF YOU

> POSTED ONLINE AND EVEN PHOTOS OF YOU NUDE.  I
> KNOW YOU HAVE BEEN GIVING YOUR PHONE NUMBER
> OUT AND I KNOW A LOT MORE(LIKE HOW YOU KEEP
> SAYING YOU WANT TO GET PREGNANT BY ANYONE).
> NOW HERE IS THE DAL I HAVE ENOUGH TO HAVE YOU
> PUT IN A PSYCO WARD, YOUR BROTHER AND SISTER
> REMOVED AND YOUR MOM LOCKED UP FOR 5 YEARS.
> YOU WILL BE NEVER ALLOWED TO SEE ANY OF YOUR
> FRIENDS AGAIN ([female name] OR ANYONE ELSE)
> BECAUSE YOU WILL BE ADOPTED HERE TO DO, I
> ALSO HAVE SOME CASHIERS CHECKS IN YOUR NAME
> (THER ARE THE SAME AS CASH). YOU ARE GOING TO
> LOOK AT THE AMOUNT IT IS MADE OUT FOR AND
> PICK 1 OR 2 THINGS FROM THE LIST YOU WILL DO
> OR LET BE DONE FOR THAT PRICE.  IF I AGREE TO
> IT YOU KEEP IT THE CHECK AND WHAT YOU PICK
> GETS DONE.  WE WILL KEEP GOING UNTILL YOU
> HAVE ALL THE CHECKS AND ALL OR MOST ITEMS ARE
> DONE. IF YOU CAN GUESS WHAT AMOUNTS LISTED
> ARE REAL YOU GET IT WITH OUT DOING ANYTHING.
> IF YOU GET IT WRONG YOU MUST DO SOMETHING
> FROM THE LIST (MY CHOICE).

Following that are a list of amounts of United States Currency from $1000 to $10 million.  Following that this is list of 16 sexual acts, the last item on the list is "RAPE FOR REAL *****".  A post-script reads "*** this is what will happen if you do not pick from the list and we do not agree.  It will also happen if you refuse to do any of the above."  Based on this note, the photographs of teenagers other than JANE DOE, the fraudulent employment applications, and the "Sex Contract", I believe the defendant was victimizing individuals prior to JANE DOE.

   11. Based upon the above facts, there is probable cause to believe that the EMAIL PREMISES contain information and evidence relating to extortion, the enticement of minors to travel in interstate commerce for the purpose of engaging in illegal sexual acts

and the production of child pornography, in violation of Title 18, United States Code, Section 875, 2422 and 2252A(a)(5)(B), respectively.

III. TECHNICAL BACKGROUND

12. The SUBJECT EMAIL PREMISES is an email account which is hosted by aol.com (hereinafter, the "email provider"). In my training and experience, I have learned that the email provider provides a variety of on-line services, including email access, to the general public. The email provider allows subscribers to obtain email accounts at the domain name aol.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with the email provider. During the registration process, the email provider asks subscribers to provide basic personal information. Therefore, the computers of the email provider are likely to contain stored electronic communications (including retrieved and unretrieved email for the email provider's subscribers) and information concerning subscribers and their use of the email provider's services, such as account access information, the email transaction information, and account application information.

13. In general, an email that is sent to the email provider's subscriber is stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the email. If the subscriber does not delete the message, the

message can remain on the email provider's servers indefinitely.

14. When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to the email provider's servers, and then transmitted to its end destination. The email provider often saves a copy of the email sent. Unless the sender of the email specifically deletes the email from the email provider's server, the email can remain on the system indefinitely.

15. A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by the email provider but may not include all of these categories of data.

16. A subscriber of the email provider can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the email provider.

17. In my experience, subscribers do not routinely copy emails stored in their aol.com account in order to store the emails on a home computer or other location, although it is possible to do so. This is particularly true when they access their aol.com account through the web, or if they do not wish to maintain particular emails or files in their residence.

12

18.  In general, email providers like aol.com ask each of their subscribers to provide certain personal identifying information when registering for an email account.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

19.  Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the email provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

20.  In some cases, email account users will

communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

21. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

IV. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

22. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the email provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

V. CONCLUSION

23. Based on my training and experience, and the

14

facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of the email provider there exists evidence of crimes.  Accordingly, a search warrant is requested.

24.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

25.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

15

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESS "PARAMOUNTPICS1@aol.com"

s/ Robert Mancene

                                                    _____
                                                    Robert Mancene
                                                    Special Agent
                                                    Homeland Security Investigations

Sworn to before me this
  31st    day of July, 2012

s/ Joan Azrack
_____
THE HONORABLE Joan M. Azrack
United States Magistrate Judge

16

## **ATTACHMENT A**
Property to Be Searched

This warrant applies to information associated with the email address PARAMOUNTPICS1@aol.com, that are stored at premises owned, maintained, controlled, or operated by Aol.com, a company headquartered in New York, NY.

**ATTACHMENT B**
Particular Things to be Seized

I.   Information to be disclosed by Aol.com

To the extent that the information described in Attachment A is within the possession, custody, or control of aol.com, aol.com is required to disclose the following information to the government for each account or identifier listed in Attachment A from June 1, 2011 until June 3, 2012:

   a.   The contents of all emails stored in the account, including copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

   b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   c.   All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

   d.   All records pertaining to communications between aol.com and any person regarding the account, including contacts with support services and records of actions taken.

II.  Information to be seized by the government

All information obtained from aol.com will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing all information described

above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 875, 2422 and 2252A(a)(5)(B) including, for each account or identifier listed on Attachment A involving Gregory John Schaffer from June 1, 2011 to June 3, 2012, information pertaining to the following matters:

    a.    Information and evidence relating to extortion, the enticement of minors to travel in interstate commerce for the purpose of engaging in illegal sexual acts and the production of child pornography, in violation of Title 18, United States Code, Sections 875, 2422 and 2252A(a)(5)(B), respectively.

    b.    Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.